Miles F. Ehrlich (CSB 237954)
miles@ramsey-ehrlich.com
Karli Sager (CSB 234819)
Mary Kelly Persyn (CSB 264782)
RAMSEY & EHRLICH LLP
803 Hearst Avenue
Berkeley, CA 94710
Telephone:   (510) 548-3600
Fax:          (510) 291-3060

*Attorneys for Defendant Anthony Johnston*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES,<br><br>                Plaintiff,<br><br>        vs.<br><br>ANTHONY JOHNSTON,<br><br>                Defendant. | Case No.: CR-09-0103-CRB<br><br><br>Court:  Judge Breyer<br>Date:   July 21, 2010<br>Time:   2:15 p.m. |

## DEFENDANT ANTHONY JOHNSTON'S SENTENCING MEMORANDUM

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................... 1

II. PERSONAL BACKGROUND ...................................................................... 2

   A.  Mr. Johnston's Severe Childhood Abuse and Resulting Addiction ....................... 2

   B.  Mr. Johnston's Continued Substance Abuse and Offense History ...................... 6

   C.  Mr. Johnston's Marriage to RoseMarie Johnston ................................. 6

   D.  Mr. Johnston's Character and Compassionate Nature ......................................... 8

   E.  Mr. Johnston Sought Treatment for his Addiction and Secured Gainful Employment ........................................................................................ 11

   F.  Mr. Johnston's Relapse into Heroin Use and Suicidal Ideation Following the Death of His Mother ........................................................................... 12

   G.  Mr. Johnston's Ultimate Success in Overcoming His Addiction and Resuming Gainful Employment ............................................................... 13

III.  THE PLEA AGREEMENT ....................................................................... 15

IV. ARGUMENT:  THE COURT SHOULD ADOPT THE RECOMMENDATION OF THE PROBATION OFFICE AND IMPOSE A SENTENCE OF 168 MONTHS ................ 16

   A.  Personal History and Characteristics .................................................. 18

   B.  The Career Offender Designation Overstates His Criminal History .................... 19

   C.  Mr. Johnston's Overall Character ...................................................... 21

V.  CONCLUSION ......................................................................................... 23

## I.       INTRODUCTION

Anthony Johnston comes before this Court for sentencing after pleading guilty to conspiring to distribute controlled substances and to being a felon in possession of a firearm.  Under the plea agreement, the parties have stipulated to an agreed-upon range of 168 to 262 months – in other words, from 14 years of incarceration, at the low end, to a high of 21 years and 10 months.  For the reasons presented below, we join with the Probation Office in asking this Court to sentence Mr. Johnston to 14 years in prison, a substantial punishment that is more than sufficient to serve the ends of justice in this case.

Anthony Johnston is 52 years old.  He is a devoted husband.  And he is known to both family and friends as a deeply generous and caring individual.  At the same time, he has not led an unblemished life.  Both in his young adulthood, and now more recently as he approaches middle age, Mr. Johnston has made some truly terrible decisions in his life and he has committed crimes for which he alone bears full responsibility.  Mr. Johnston would be the first to acknowledge that – at his age, and with his life experience – he should have known better than to become involved with drugs.

And yet, in deciding how severely Mr. Johnston must now be punished, it is impossible to ignore the unusually tragic circumstances of his upbringing and the destructive impact that severe childhood abuse can have on a person's sense of self-worth, his capacity for good judgment, and his ability to cope successfully with life's challenges well into adulthood.  This is particularly true when the abuse is as extreme and as prolonged as that which Anthony Johnston was forced to endure at the hands of a heroin-addicted stepfather – who beat him brutally beginning at the age of 7, sexually abused him, kept him locked in a closet for days, and forcibly injected him with heroin from the age of 11.  With this sort of home life, it is hardly surprising that Anthony Johnston came to be addicted to heroin by the age of 14, failed to graduate from high school, and had brushes with the criminal justice system soon thereafter.  And it is no

less surprising that Mr. Johnston has on repeated occasions exercised poor judgment and poor self-control, even as an adult.

Mr. Johnston deeply regrets his actions, and accepts complete responsibility for them.  He fully comprehends that he alone is to blame for the severe consequences he now faces.  Mr. Johnston's traumatic childhood cannot – and should not – excuse his conduct in this case.  But as the Probation Officer has observed, it provides necessary context for understanding "who the defendant is and how he got to this point," *see* Presentence Investigation Report ("PSR"), Sentencing Recommendation at 2, two critical issues that guide the Court as it fashions a fair and just sentence in this case.

We respectfully suggest that, when all of the circumstances of Mr. Johnston's life and his offenses are balanced together and considered fairly, a sentence of 14 years is more than adequate to punish Mr. Johnston severely, to deter future crimes, and to fulfill all the other purposes of federal sentencing set forth in 18 U.S.C. §3553.

## II.      PERSONAL BACKGROUND

### A.      Mr. Johnston's Severe Childhood Abuse and Resulting Addiction

Anthony Johnston was born on August 20, 1957, the second of two sons born to James Johnston and Josephine Montgomery.  When Anthony was less than two years old, his father and mother divorced.  Shortly after the divorce, his mother married Wilford Romero, a heroin addict and serial abuser, with whom she went on to have four more children.

Tragically, Romero's arrival ushered in a lengthy period of physical, sexual, and psychological abuse directed against Anthony, his mother, and the other children in the home.  Romero's abuse sentenced Mr. Johnston to a lifetime of trauma and still haunts him today.  In 1978, Mr. Johnston's probation officer Richard C. Skewis, who had coincidentially served as Romero's supervising probation officer in the 1960s, documented some of this abusive past in a presentence report.  Probation Officer's Report and Recommendation, Case No. H274 (Alameda County) (Jan. 30, 1978) ("1978

Probation Report"), Exh. A at 4-10.  A host of other letters, including Mr. Johnston's own, corroborate the impact of these truly horrifying circumstances on his life.

The serious abuse began when Anthony was about 7 years of age.  When angered, Romero would strike Anthony not just with his fists, but with objects such as an iron, a cord, a hanger, a choker chain, or a belt.  PSR at ¶ 76; Letter from Anthony Johnston, Exh. A at 1.  Some of the violence was serious enough to give Anthony black eyes, and Romero once knocked out Anthony's front teeth.  *Id.*  On occasion, Romero would also lock Anthony in a closet for several days at a stretch.  *Id.*  Additionally, Romero sexually abused Anthony in ways that have caused him to suffer lasting shame and anguish to this day.  PSR at ¶ 76; Letter from RoseMarie Johnston, Exh. A at 2.

Romero created a truly appalling home environment in which to raise children. In addition to being both physically and sexually abusive toward Anthony, Romero "used narcotics in front of [Mr. Johnston] and the other children in the home, and had numerous other addicts in and around the home a great deal of the time."  1978 Probation Report, Exh. A at 9.  From a very young age, Anthony would be present while his stepfather used and sold heroin.  Other addicts, including Anthony's maternal uncle, gathered at the home and also injected themselves with heroin in front of Anthony.  *Id.* Sometimes Romero would force Anthony to go up on the roof or out in the street to serve as a look-out for police while Romero sold drugs.  PSR at ¶ 75.  Marcia Weisman, Anthony's sixth grade teacher, also wrote that Romero forced Anthony to venture out to "score" drugs for him.  Exh. A at 20.

But the abuse took an even more incomprehensible turn when Romero began to forcibly inject Anthony with heroin, beginning at the age of 11.  As Mr. Johnston describes it:

> At [age 11] is when the abuse turned worse.  Wilford began to inject me with heroin at this time.  He would lock me in the room and the closet, even though I did not want to be injected.  He would threaten that he would beat me if I wouldn't let him inject me.  He would tie me off just like he would tie himself off and share needles with me.  If my mother would

try to help me or get in his business he would beat her to a pulp.  This abuse went on for many years.

Exh. A at 1; PSR at ¶ 75.

Police, Child Protective Services, and school officials knew about the abusive circumstances of Anthony's home life, but could do almost nothing to help alleviate the situation.  As his sixth grade teacher, Ms. Weisman, recalls in her letter, Anthony's mother would send Anthony and her other children to school with notes safety-pinned to their shirts saying that Romero was beating and abusing the family.  Exh. A at 20.  But Anthony's mother, who was the victim of abuse herself and seen frequently in a bruised and battered condition, always refused to sign any criminal complaint against her husband.  *Id.*; 1978 Probation Report, Exh. A at 7.

Despite the hardships he suffered at home, Anthony somehow grew into a boy who was both well-behaved and well-regarded by his teachers during his elementary school years.  For example, Ms. Weisman states that "[e]very teacher takes joy in the two or three students in their career who really touch their heart.  Anthony was that student for me."  Exh. A at 20.  Ms. Weisman notes that, while Anthony had a "horrific home life," he was nevertheless a "delightful child" who "soaked up everything that was offered to him."  *Id.*  She remembered that Anthony worked very hard at school and took the singing lead in the sixth grade operetta.  Ms. Weisman was struck by Anthony's circumstances, and tried to "think of ways to encourage him and enlarge his experience in life."  In a rather extraordinary act of generosity, Ms. Weisman took Anthony skiing and brought him to her family's summer cabin in Michigan.  *Id.*; Letter from RoseMarie Johnston, Exh. A at 13.

Ms. Weisman was not the only adult who tried to help alleviate the destructive impact of Anthony's home life.  In early 1967, when Anthony was 10 years old, representatives of the Alameda County Adult and Juvenile Probation Departments, the county guidance clinic, local school officials, and the county health department all joined forces in an attempt to "resolve this family's numerous problems" with the hope that "the

numerous children would not follow in their father's or stepfather's [Romero's] footsteps." 1978 Probation Report, Exh. A at 7. They devised a "carefully planned program," which included family therapy services and a car that was given to the family. Romero and Anthony's mother, however, failed to keep numerous appointments, which caused the program to "completely fail." *Id.* Later, the donated car was seen in front of a known narcotics dealer's house. *Id.* And as noted above, it was after the failure of this intervention, when Anthony was 11 years old, that Romero began to forcibly inject his stepson with heroin.

By the time Anthony was 13 years old, his mother and Romero had split. But soon thereafter, Anthony's mother became involved with another narcotics user, Danny Resendez. 1978 Probation Report, Exh. A at 8; PSR at ¶ 79. While Resendez did not physically or sexually abuse Anthony, he did use heroin with him. Anthony dropped out of school while he was in the ninth grade at Marina High School. And by the time he was just 14 years old, Anthony was fully addicted to heroin. PSR at ¶ 80.

Over the years, Anthony tried numerous times to escape his abusive home life. He first ran away from home at the age of 7. PSR at ¶ 77. And while he was still a child, Anthony lived for significant periods of time by himself on the streets. Letter from Anthony Johnston, Exh. A at 1. At various times, he was placed by the authorities in orphanages and with foster care parents. *Id.* When he was approximately 13 years old, he lived with his biological father for a short time, but this arrangement did not work out, given Anthony's deep and enduring emotional ties to his mother. Letter from RoseMarie Johnston, Exh. A at 13-14; PSR at ¶ 80. In the end, Mr. Johnston was always driven to return home to his mother. Letter from RoseMarie Johnston, Exh. A at 14; PSR at ¶ 80.

Three days after he turned 17, Anthony joined the Army. While in the armed forces, he became a hydraulic and pneumatic specialist and he was stationed in Fort Ord in Monterey, California and in Fort Hood, Texas. He received an honorable discharge in January of 1976. U.S. Department of Defense, Form 214, Report of Separation from Active Duty, Exh. A at 21. But soon afterward, Anthony returned home

to the life he had left, and once again began using heroin with Mr. Resendez.  PSR at ¶ 81.

### B.    Mr. Johnston's Continued Substance Abuse and Offense History

Anthony – now Mr. Johnston – returned home from the Army no longer a child. Unfortunately, his addiction led him to commit a number of offenses in the two years following his return, including disturbing the peace and two robberies.  At the time of these offenses, Mr. Johnston reported that he had been using heroin quite extensively and was under the influence during the robberies. 1978 Probation Report, Exh. A at 6.

Despite now being 20 years old, Mr. Johnston was committed to the California Youth Authority ("CYA") for the robberies.  In part, this was because the probation officer randomly assigned to Mr. Johnston had, by coincidence, previously supervised his stepfather, Romero, and thus knew first-hand about the extensive abuse and neglect visited upon Anthony when he was a child.  1978 Probation Report, Exh. A at 7.  Mr. Johnson earned his GED during his CYA commitment.  General Educational Development Testing Service of the American Council on Education, Official Test Reports, Exh. A at 22.  During his time at CYA, he also worked as a firefighter.  PSR at ¶ 91.

Following his release from CYA, however, Mr. Johnston again returned to drug use despite his continued struggles to stay clean.  He became involved with a gang and he committed a number of additional thefts, robberies, and burglaries during his twenties.  The last of these offenses, which occurred when Mr. Johnston was 28 years old, was an incident involving burglary, robbery with a knife, and false imprisonment. This resulted in a 13-year sentence, of which Mr. Johnston served over five years in prison.  PSR at ¶ 59.

### C.    Mr. Johnston's Marriage to RoseMarie Johnston

In August 1988, while he was incarcerated at CCI Tehachapi, Mr. Johnston's life took a dramatic turn for the better:  He met RoseMarie Vega, a woman who would later became his wife.  Letter from Anthony Johnston, Exh. A at 2.  Mr. Johnston's cellmate,

Miguel Alfaro, was RoseMarie's brother.  At times when Mr. Alfaro was unable to call their mother, Mr. Johnston would call her on his behalf and let her know how her son was doing in custody.  RoseMarie and her mother were greatly touched by Anthony's caring.  And on Mr. Johnston's birthday in 1988, they completed a form to visit Mr. Johnston themselves.  Letter from RoseMarie Johnston, Exh. A at 11.

The next day, RoseMarie and her mother met Mr. Johnston during visiting hours. While RoseMarie's mom and nieces were busy talking to her brother, Mr. Johnston and RoseMarie spent several hours talking.  RoseMarie recalled, "[t]hose few hours of visiting really had me thinking of him as a sensitive caring person . . . a very nice guy . . . [a] guy that I felt very comfortable with, just the way he presented himself to us and spoke."  The next day, RoseMarie bought Mr. Johnston a belated birthday card.  At the same time, Mr. Johnston sent RoseMarie a card thanking her for her visit.  From that moment, RoseMarie and Anthony became "prison pen pals."  Letter from RoseMarie Johnston, Exh. A at 11-12.

Early the next year, their relationship changed.  In early 1989, RoseMarie's mother passed away unexpectedly.  Mr. Johnston received special permission to call RoseMarie to offer his condolences.  What he said during this call gave tremendous comfort to RoseMarie.  And as she recalls it, "[f]rom that day on he had won my heart, more than he could have imagined."  Letter from RoseMarie Johnston, Exh. A at 12.

Then, for nearly four years, RoseMarie and Mr. Johnston shared their lives through countless letters, phone calls, and visits.  They wrote almost every day and frequently talked on the phone.  RoseMarie visited Mr. Johnston once or twice a month. On many occasions, RoseMarie would bring her 11-year old daughter, who enjoyed playing UNO, Battleship, and other games with Mr. Johnston.  During their phone conversations, letters, and visits, Mr. Johnston confided in RoseMarie about his abusive stepfather, his drug use, and his criminal history.  Letter from RoseMarie Johnston, Exh. A at 12-15.

When Mr. Johnston was released from prison on November 7, 1992, RoseMarie

picked him up.  "He was at that time, as he is now a special part of my life."  She was not frightened by Mr. Johnston's past.  As she describes it, "I felt that I had known him all my life.  I trusted and believed in him with my heart, my soul, my life and with the 2 most important individuals of my life . . . my 11 year old daughter and my 4 year old grandson."  Letter from RoseMarie Johnston, Exh. A at 14-15.

The next week, Mr. Johnston met RoseMarie's eight brothers and sisters and other members of RoseMarie's family.  RoseMarie's family warmed immediately to Anthony, and in late December 1992, the two were married.  Letter from RoseMarie Johnston, Exh. A at 15.  As Mr. Johnston describes it: "At this point my life started to make a big change because I got to marry the woman of my dreams.  Life was on my side and had a meaning."  Letter from Anthony Johnston, Exh. A at 2.

Mr. Johnston got a job driving tow trucks and doing other odd jobs.  *See, e.g.*, California Tow Truck Association, Tow Truck Driver Training Program, Certificate of Achievement—Light Duty Recovery Course (Feb. 7, 1994), Exh. A at 23.  Meanwhile, RoseMarie continued working for the same insurance company where she has worked since 1975, most recently as a senior client administrator.  Letter from RoseMarie Johnston, Exh. A at 11.  RoseMarie and Anthony Johnston started to build their new life together.

**D.     Mr. Johnston's Character and Compassionate Nature**

Mr. Johnston embraced RoseMarie's clan as the loving and stable family he never had as a child, and he quickly won the hearts of his new family and friends.  As RoseMarie's niece, Lavon Lopez, observes:  "Many people see his exterior presentation as intimidating with all of the tattoos and such.  However, he is one of the most generous, unselfish men I know."  Letter from Lavon Lopez, Exh. A at 27.  Similarly, RoseMarie's sister, Dorothy Ingram, who refers to Mr. Johnston as "Bro Tone," said she could not have wished for a better man for her sister.  Letter from Dorothy Ingram, Exh. A at 25.  Another member of the extended family describes him as "the man whose smile brightens the room."  Letter from DeAngela Glover (RoseMarie's grandson's

mother), Exh. A at 31.

Mr. Johnston attended countless outings, birthdays, and social events over the years.  Letter from Tami Chan, Exh. A at 41.  And from the beginning, he always made sure to bring gifts during family visits.  "The gifts were given from the heart, they meant something.  It wasn't just something to give someone.  It was something he had seen at a yard sale, something he gotten from a ball game, something he found or been given to him that he knew would be appreciated because "Uncle Tony" gave it to them."  Letter from Dorothy Ingram, Exh. A at 25.

Many of Mr. Johnston's friends and family have written to the Court to describe the numerous ways in which he has reached out to them with compassion and generosity.  As RoseMarie's cousin Paul Flores puts it:  "Anthony has a good heart; he is the type of person who would give you the shirt off his back and the first one to help you do anything you need done."  Letter from Paul Flores, Exh. A at 42.   For instance, Mr. Johnston helped Mr. Flores remodel his kitchen.  *Id.*  Another cousin remembers how, in the middle of the summer, Mr. Johnston travelled to Modesto to help build a deck for his sister-in-law.  "[I]t had to be 100 degrees outside. . . He was so proud and did a great job.  He is very handy and can do almost anything."  Letter from Lynette Mercado, Exh. A at 40.  And when RoseMarie's daughter-in-law needed a car, Mr. Johnston gave her his car without hesitation and without any expectation in return.  "This is the type of person that he is."  Letter from Patricia Morales, Exh. A at 43.

One friend, Rose Villegas, recalls introducing Mr. Johnston to her younger brother Ricky.  "Well it was soon after, to my surprise, I discovered Anthony had driven to Fremont to help Ricky with some work renovating Ricky's house."  Letter from Rose Villegas, Exh. A at 44.  In the words of Rebecca Flores: "He would give you his last dollar if you asked.  It didn't even matter who you were. . . . He would go to see why your car is stalling to sitting up with you all night while your mother or brother is dying."  Letter from Rebecca Flores, Exh. A at 45.

At the end of January 2007, RoseMarie's brother, Alfred Elizares, became very

ill.  For twenty-seven days, Anthony stood by RoseMarie's side, visited the hospital daily, and checked up on Alfred's partner.  One morning, at around 5:30 am, Alfred wanted pancakes from his favorite restaurant.  Anthony brought the pancakes to Alfred's hospital room by 7:00 am.  "He walked in the room with that happy face of his, saying meals on wheels."  Alfred passed away a day later.  Letter from RoseMarie Johnston, Exh. A at 18.

Not only has Mr. Johnston been generous with his time, his belongings, and his talents, but he has also shared his past experiences with his new family so that others, especially the younger people, could learn from his mistakes.  As Rebecca Flores points out, "Our family doesn't have a lot of male role models, however Tony is one.  He is not just an ordinary family member, he is a great uncle, brother, husband and father."  Letter from Rebecca Flores, Exh. A at 45.  RoseMarie's niece echoes this sentiment: "One of the more admirable things about Uncle Tony is that he is always quick to share stories about his past as a cautionary tale to our family's younger generation.  He talks about how he would jump at the chance to talk some sense into the younger, ignorant kid he was so he could avoid all the heartache and missed experiences he'll never get back."  Letter from Lavon Lopez, Exh. A at 27.

Over time, Anthony also developed a special relationship with RoseMarie's son, Ramon Morales.   At first, Ramon (who was then in his early twenties and just back from the Marines) questioned RoseMarie's decision to marry an "ex con."  Letter from RoseMarie Johnston, Exh. A at 16.  But as the years passed, Anthony won him over.  Anthony taught Ramon skills such as carpentry, construction, and painting.  As Ramon has said himself, Anthony "was a strong support system for me when I was having my own family problems.  I [am] not sure what I would have done if he was not there to listen to me, to give me advice and help calm [me] down."  Letter from Ramon Luis Morales Jr., Exh. A at 33.

Similarly, Anthony formed an "irreplaceable" bond with Ramon's son (and RoseMarie's grandson) Démone.  "Anthony is the only grandfather that Démone has

known from day one." Démone helps Anthony with "the gardening, odd jobs, painting, [and] working on things in the garage workshop." Letter from DeAngela Glover (Démone's mother), Exh. A at 29-30. They also enjoyed baseball games together, sometimes going to more than 70 games a season. If they "weren't at the Giants, [they] would be off at the A's games, especially if it was bobble-head giveaway day. They would collect all of them." Letter from RoseMarie Johnston, Exh. A at 16.

In addition to friends and family, Mr. Johnston also developed strong ties to the neighbors in his new community. He frequently offered help whenever a neighbor needed it, whether it was replacing a toilet or carrying groceries into the house. As one neighbor says in her letter, "[h]e is always looking out for the neighborhood and assisting other neighbors throughout these years that he has lived on our block." Letter from Bonnie Basso, Exh. A at 48. Another neighbor recalled how Anthony helped replace a fence that had blown over during a bad storm. He "even let us know that Home Depot was having a sale on posts. When time came to actually replace it, he came right over with his circular saw, nail gun, and level. It only took us a few hours thanks to his help." Letter from Lisa Basso, Exh. A at 49.

### E. Mr. Johnston Sought Treatment for his Addiction and Secured Gainful Employment

Despite his happy marriage and the new stability it brought to his home life, Mr. Johnston struggled with issues relating to personal relationships and the challenges of adjusting to life outside prison. Letter from Kellie M. Rollins, Psy.D., to Probation Department (Jan. 3, 2007), Exh. A at 51. As RoseMarie's best friend, Kathy Duarte, put it: "As in any new family, there were 'adjustments' to be made. I won't say it was perfect. Anthony had been locked up for a long time and it's hard to get used to the outside world let alone a wife and children." Letter from Kathleen Duarte, Exh. A at 35.

Perhaps most important, Mr. Johnston continued to struggle with the heroin addiction that had plagued him since age 14. With RoseMarie's help, Mr. Johnston devoted himself to a number of substance abuse treatment programs. Beginning in

1993, Anthony was a patient at the BAART methadone clinic.  He attended daily
treatment at BAART until approximately 1995.  He then entered the Menlo Park
Veterans Affairs (VA) Inpatient Program for substance abuse from June through
September of 1995.  And in December of 1996, Anthony began treatment at the San
Francisco VA Medical Center, which included his participation in the methadone clinic.
He was treated there again in 2003 and 2004.  Letter from Roland Langlois, Vocational
Specialist / Case Coordinator, San Francisco VA Medical Center (Feb. 2, 2004), Exh. A
at 54; Letter from Dr. Scott Smollar, Psychiatrist, Addiction Medicine, San Francisco VA
Medical Center (Feb. 3, 2004), Exh. A at 55.

Mr. Johnston's hard work to rid himself of his addiction began to pay off.  In 1997,
he was hired by the Department of Veteran Affairs in San Francisco to do housekeeping
and general maintenance.  Letter from RoseMarie Johnston, Exh. A at 16.  At this point,
Mr. Johnston was free of heroin, and his marriage was bringing new meaning to his life.
Letter from Anthony Johnston, Exh. A at 2.  As Kathleen Duarte states, "for as long as
I've known Anthony, when not involved in drugs, he was a happy, loving, caring man
who loves his wife unconditionally.  Even though it's taken awhile of adjustment periods,
I finally start[ed] seeing how happy he was in his marriage, his job and his life."  Letter
from Kathleen Duarte, Exh. A at 38.

### F.   Mr. Johnston's Relapse into Heroin Use and Suicidal Ideation Following the Death of His Mother

In May 1998, Mr. Johnston's mother passed away.  Initially, RoseMarie thought
things were fine with Anthony, but as time went on she knew "[s]omething was just not
right."  Mr. Johnston had started to drift.  He was spending too much time by himself in
the garage.  He was not sleeping.  He was missing work and not coming home.  During
this time, he left his job, and "he was about to crash."  Letter from RoseMarie Johnston,
Exh. A at 17.

In truth, Anthony had begun using heroin again.  He left his job and was "in and
out of the house, on the streets, living in doorways, freeway ramps and just about

anywhere." Exh. A at 17.  RoseMarie believed that the death of his mother, combined with the weighty memories of his past and his return to drugs, drove him back to his former life, and during this period he did stints as an inpatient at Mills Peninsula Hospital at least three times.  *Id.*

Mr. Johnston's wife, however, never gave up on him.  In August 2001, on Anthony's birthday, RoseMarie went looking for Mr. Johnston on the streets and eventually found him in a state of utter despair.  Letter from RoseMarie Johnston, Exh. A at 17.  Anthony told RoseMarie that he was at his breaking point, and that he wanted to end his life by throwing himself in front of a BART train.  RoseMarie drove Anthony to the Palo Alto VA Hospital, where he was involuntarily admitted and held for 72 hours. *Id.* But soon after his release from the hospital, Mr. Johnston again abandoned his home and lived on the streets for at least a year.  Letter from RoseMarie Johnston, Exh. A at 17.

At this point, Mr. Johnston was 44 years old.  His last conviction was for conduct that had taken place nearly 17 years earlier, when he was just 28 years of age.  But in January 2002, Anthony slipped again.  In the throes of his addiction, he was arrested for selling $20 worth of heroin to an undercover agent.  He later served six months in county jail for this offense.

### G.    Mr. Johnston's Ultimate Success in Overcoming His Addiction and Resuming Gainful Employment

In 2002, with the strong support of his family, Mr. Johnston devoted himself fully to beating his addiction and turning his life around.  He began active treatment in the Substance Abuse Programs at the San Francisco Veterans Affairs Medical Center "in an effort to restore a semblance of stable life of abstinence and to reconnect with his family."  Letter from Gloria Wilcher (Oct. 23, 2009), Exh. A at 52.  There, he attended group therapy sessions 2 to 3 times per week with good attendance and participation. He also participated in weekly individual psychotherapy.  Letter from Kellie M. Rollins (Oct. 27, 2009), Exh. A at 53; *see also* Letter from Roland Langlois (Feb. 2, 2004), Exh.

A at 54; Letter from Dr. Scott Smolar (Feb. 3, 2004), Exh. A at 55.  In May 2007, Anthony satisfactorily completed the VA's Mood Management Group program.  *See* Department of Veterans Affairs, Certificate of Completion: Mood Management Group (May 1, 2007), Exh. A at 56.  This time, the substance abuse treatment program worked, and Tony has been clean since late 2002.  Letter from Gloria Wilcher (Oct. 23, 2009), Exh. A at 52; Letter from Anthony Johnston, Exh. A at 3.

In the course of his recovery, Mr. Johnston took a leadership role with peers and mentored other addicts.  Letter from Kellie M. Rollins (Oct. 27, 2009), Exh. A at 51. According to Staff Psychologist Gloria Wilcher, Anthony "acted as a peer counselor for veterans and others who were struggling with their addiction.  His attendance was faithful; his participation was active and he drew on his own personal experience." Letter from Gloria Wilcher (Oct. 23, 2009), Exh. A at 52.  He took one friend from the group therapy fishing, "something [he] hadn't done since [he] was a kid."  Letter from Leonard L. George, Exh. A at 57.  And he helped another friend from the program make repairs to his house.  Letter from Michael Smith, Exh. A at 58.

Although Mr. Johnston had finally brought his drug addiction under control, he had not yet landed stable, continuous employment.  He had a wife and family he wanted to help support, but no steady job that would make this possible.  Mr. Johnston did his best to explore his available job options.  He applied for his old position at the San Francisco VA Department.  He did odd jobs in the construction trades.  And he tried to improve his prospects through education, taking classes at San Francisco City College. In May of 2007, he successfully completed a three-part course at City College called Introduction to Construction Trades, which consisted of 216 hours of studies.  City College, Certificate, Introduction to Construction Trades A-B-C (May 25, 2007), Exh. A at 59.  But none of the job opportunities panned out, and Mr. Johnston became frustrated and depressed.

With limited opportunities for work, but easy access to heroin, Mr. Johnston made a monumentally misguided, indefensible, and tragic decision in 2006.  He began

to sell drugs on the side to make money.  This serious lapse of judgment gave rise to the offenses that have now brought him before this Court.  For when the undercover agent approached Mr. Johnston seeking to buy heroin and then later a gun, Mr. Johnston readily obliged.

In December 2007, Mr. Johnston did finally get his old job back as a housekeeping aide at the VA for $14.64 per hour.  Letter from Zetta M. Ferguson to Anthony Johnston (Dec. 13, 2007), Exh. A at 60.  At his first review, he received an "exceptional" or a "fully successful" performance standard on every element of his job duties.  His supervisors remarked that Mr. Johnston "can be relied upon to complete the tasks as assigned with minimal supervision;" is "courteous to patients, visitors and hospital staff;" and "completes all assigned duties with diligence and professionalism." Department of Veterans Affairs, Performance Appraisal Program, Performance Plan and Appraisal of Anthony Johnston (Oct. 1, 2007-Sept. 30, 2008), Exh. A at 61.  In a letter of recommendation, the head nurse stated that Mr. Johnston is "consistently pleasant and polite as he labors diligently and conscientiously with his assignments. . . When challenging events occur, Anthony is there with a resolution and a smile while leaving behind a shiny and sparkling unit."  Letter from Nancy Christen, RN Unit 1A to Richard Fernandez, Chief, EMS (August 27, 2008), Exh. A at 67.  She observed that "[h]e is a team player and makes a great asset to our VA hospital organization."  *Id.*  But Mr. Johnston's employment at the VA hospital ended with his arrest in this case.

III.    **THE PLEA AGREEMENT**

On September 23, 2009, Mr. Johnston entered a guilty plea to one count of conspiring to possess and distribute Schedule I and Schedule II controlled substances, in violation of Title 21 U.S.C. §§ 846, 841 (b)(1)(A)(i) and 841(b)(1)(A)(viii), and one count of being a felon in possession of a firearm, in violation of Title 18 U.S.C. §922(g)(1).  Mr. Johnston and the Government executed a binding plea agreement, pursuant to Federal Rules of Criminal Procedure 11(c)(1)(A) and 11(c)(1)(C), in which

they agreed that the total adjusted combined offense level under the Guidelines is 34. The parties also agreed that, as a result of two qualifying felonies, Mr. Johnston is deemed a career offender under § 4B1.1, and as a result of this designation, his Criminal History category is increased from Category IV to Category VI.

Under the Plea Agreement, the parties have agreed that any sentence of incarceration within the range of 168 months to 262 months would be reasonable and appropriate, given the purposes of sentencing set forth in 18 U.S.C. § 3553. The bottom of this range – 168 months – represents the low end of the otherwise applicable sentencing range if Mr. Johnston were *not* classified as a career offender (OL 32 and CH Category IV). The top of this range represents the low end of the sentencing guidelines applicable to Mr. Johnston if he is deemed to be a career offender (OL 34 and CH Category VI).

The Presentence Report recommends a sentence of 168 months, the low end of the agreed-upon range. We concur in this recommendation.

## IV.    ARGUMENT:  THE COURT SHOULD ADOPT THE RECOMMENDATION OF THE PROBATION OFFICE AND IMPOSE A SENTENCE OF 168 MONTHS

Following the Supreme Court's decisions in *United States v. Booker*, 543 U.S. 220 (2005); *Rita v. United States*, 551 U.S. 338 (2007*); Kimbrough v. United States*, 552 U.S. 85 (2007); and *Gall v. United States*, 552 U.S. 38 (2007), courts have consistently held that the United States Sentencing Guidelines are no longer mandatory, but are merely advisory. *United States v. Carty*, 520 F.3d 984, 990 (9th Cir. 2008) (en banc). "One theme" runs through the recent sentencing decisions: *Booker* and its progeny "empowered district courts, not appellate courts . . . . [and] breathe[d] life into the authority of district court judges to engage in individualized sentencing." *United States v. Whitehead*, 532 F.3d 991, 993 (9th Cir. 2008) (quoting *United States v. Vonner*, 516 F.3d 382, 392 (6th Cir. 2008) (*en banc*) (Sutton, J.)).

The overarching statutory charge for a district court is to "impose a sentence

sufficient, but not greater than necessary" to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. *Carty*, 520 F.3d at 991 (quoting and citing 18 U.S.C. § 3553(a) and (a)(2)). "All sentencing proceedings are to begin by determining the applicable Guidelines range," *id.*, which serves as a "starting point and the initial benchmark." *Gall*, 552 U.S. at 49.

But the Guidelines range is only one factor among many that the Court must consider. *Carty*, 520 F.3d at 991. The Court must also consider each of the other factors set forth in § 3553(a). *Id.* Section 3553(a) sets forth those factors and the purposes they serve, including the history and characteristics of the defendant, the need for adequate punishment and deterrence, and the need to avoid disparate sentences for similar conduct. Specifically, the court must weigh:

> the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed; the kinds of sentences available; the kinds of sentence and the sentencing range established in the Guidelines; any pertinent policy statement issued by the Sentencing Commission; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims.

*Id.* (citing 18 U.S.C. § 3553(a)(1)-(7); *Gall*, 552 U.S. at 44-45 n. 6).

The precise weight accorded to any 18 U.S.C. § 3553(a) sentencing factor, including the Guidelines themselves, rests within the discretion of the sentencing court, and the appeals courts must "review all sentences, within and without the Guidelines range, under a deferential abuse-of-discretion standard." *Carty*, 540 F.3d at 988 (citing *Gall v. United States*, 552 U.S. 38 (2007)). Sentencing judges are permitted to consider their "own sense of what is a fair and just sentence under all the circumstances." *United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006). Indeed, the Court "has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime. . . . [A]s a result, [the Court is] generally free to impose sentences

outside the range of imprisonment recommended by the advisory Guidelines." *United States v. Cavera*, 550 F.3d 180, 188-89 (2d Cir. 2008) (*en banc*).

Significantly, the Ninth Circuit has specifically declined to adopt a presumption that a sentence falling within the Guidelines range is reasonable, and has stated that "a court of appeals may *not* presume that a non-Guidelines sentence is *un*reasonable." *Carty*, 520 F.3d at 994, 993. Where a reviewing court finds "neither significant procedural error nor a substantively unreasonable sentence," the trial court's sentence will stand. And substantive reasonableness is determined by consideration of the totality of the circumstances. *Id.* at 996, 993.

### A. Personal History and Characteristics

Here, as the Probation Office has concluded, the factors set forth in Section 3553(a) weigh heavily in favor of a sentence below the advisory career-offender guideline range, and more specifically a sentence at the low end of the otherwise applicable guideline range: 168 months.

First, the record demonstrates unequivocally that Mr. Johnston suffered extraordinary abuse as a child – abuse that bruised and battered his body, violated him sexually, and robbed him of any sense of security at home. The abuse then escalated to a truly horrific level when Mr. Johnston was forced as a child to participate in his stepfather's drug dealing and forcibly injected with heroin at the age of 11. This led Mr. Johnston to develop a full-fledged heroin addiction at the age of 14. Put simply, Mr. Johnston was deprived of the most basic opportunity every child should have in life – the chance to develop the psychological, physical, and educational foundations for a healthy and productive adulthood. And there is little question that the scars Mr. Johnston carries from this abuse still plague him today. To be sure, even despite these daunting circumstances, it was neither inevitable nor pre-ordained that Mr. Johnston would develop a criminal history. It simply would have been more surprising, and all the more inspiring, if he hadn't.

The sort of extraordinary abuse present in this case would have warranted a

downward departure under the guidelines, even before *Booker* made them advisory.
*See, e.g., U.S. v. Walter*, 256 F.3d 891, 894 (9th Cir. 2001) (defendant's brutal beatings,
introduction to drugs and alcohol, and sexual abuse by a family members are the type
of "extraordinary circumstances" that may warrant a departure); *U.S. v. Brown*, 985 F.2d
478 (9th Cir. 1993) (holding court could grant downward departure in light of severe
childhood abuse and neglect).  But after the Supreme Court's decision in *Booker*, the
Court, of course, has even broader discretion to consider extraordinary childhood abuse
as a basis to justify a sentence below the advisory guideline range.  We respectfully
request that the Court do so here.

**B.    The Career Offender Designation Overstates His Criminal History**

Second, while Mr. Johnston's experience with the criminal justice system is quite
extensive, the career offender designation overstates the true nature of his criminal
history, particularly in the last 15 years.  Even before *Booker,* district courts had the
authority to depart downward within the guidelines in cases where the criminal history
category overstates the seriousness of a defendant's criminal history or likelihood of re-
offending.  In the policy statement published at U.S.S.G. § 4A1.3, the Sentencing
Commission authorizes a court to depart downward if the applicable criminal history
category "significantly over-represents the seriousness of a defendant's criminal history
or the likelihood that the defendant will commit further crimes."  *See United States v.
Lawrence,* 916 F.2d 553, 555 (9th Cir. 1990).

And notably, courts have departed downward from the career offender guideline
range when one of the qualifying prior convictions was particularly stale in relation to the
instant offense, despite technically counting toward the career offender classification.
For example, relying on *United States v. Brown*, 985 F.2d 478, 481-82 (9th Cir. 1993),
the Third Circuit vacated a sentence based on a career offender designation and
remanded the case with instructions that the district court consider that the prior
offenses occurred just barely within the fifteen-year window.  *United States v. Shoupe,*
988 F.2d 440, 447 (3d Cir. 1994); *see also United States v. Collins,* 122 F.3d 1297,

1307 (10th Cir. 1997) (affirming a downward departure based in part on the fact that one of the predicate convictions occurred close to ten years prior to the instant offense and involved conduct committed outside the applicable ten-year window).  Such a consideration makes sense given that priors committed at the outer boundary of the applicable time period do not signal ongoing criminal activity or an escalation of a defendant's criminal behavior.

Following *Booker* and *Kimbrough v. United States*, 552 U.S. 85 (2007), district courts enjoy even broader freedom to determine whether prior convictions should be treated as qualifying predicate offenses for purposes of the career offender guideline. *See, e.g., United States v. Boardman,* 528 F.3d 86, 87-88 (1st Cir. 2008) (remanding case because district judge's comments at sentencing indicated that it thought it didn't have "broader discretion" in applying the career offender enhancement).  And courts have continued to depart downward when the prior offenses just barely qualify within the boundaries of the applicable time limits.  See *U.S. v. Naylor*, 359 F. Supp. 2d 521 (W.D. Va. 2005) (district court reduced a career offender sentence from 188 to 120 months, reasoning, in part, that priors barely qualified under the rules for counting convictions for the career offender designation); *U.S. v. Huerta-Rodriguez*, 355 F.Supp.2d 1019 (D. Neb. 2005) (court imposed 36 months of custody rather than 70-87 months, in part because the court would have departed for over-stated criminal history since one prior had occurred nearly 10 years before).

Whether termed a variance or a departure, a downward adjustment from the career offender guidelines is appropriate in this case.  Mr. Johnston qualifies as a career offender based on just two offenses – a robbery he committed in 1985 (at the age of 28) and a sale he made of $20 worth of heroin to an undercover agent in 2002 (at the age of 44).   PSR at ¶¶ 49, 59, and 60.  Whether they are judged individually or consdiered together, these convictions fail to indicate an escalation in Mr. Johnston's criminal activity.  Mr. Johnston's 1985 offense was committed more than 20 years before the commencement of his present offenses.  The only reason it qualifies toward

the career offender calculation is because his term of incarceration lasted until November 1992, just barely within the fifteen-year window for counting offenses for purposes of § 4B1.1.  See U.S.S.G. §4A1.2(e)(1).  And while the 2002 offense was more recent (he was convicted in 2005), the incident in question was a comparatively minor and isolated $20 sale of drugs.  Given the remoteness in time of one qualifying prior and the character of the other, Mr. Johnston's recent criminal history simply does not suggest that his involvement in crime had been deepening or accelerating in the manner that the career offender classification is designed to address.  Accordingly, we concur in the PSR's recommendation that the Court impose a sentence consistent with the low end of his otherwise applicable guideline range, rather than the career-offender advisory guideline range.

## C.   Mr. Johnston's Overall Character

Finally, Section 3553's command to consider "the history and characteristics of the defendant" certainly includes the defendant's past good deeds and positive personal attributes, such as generosity and kindness towards others.  As Judge Rakoff has written:

> But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

*United States v. Adelson*, 441 F. Supp. 2d 506, 513 (S.D.N.Y. 2006); *see also United States v. Wachowiak*, 496 F.3d 744, 745 (7th Cir. 2007) (affirming 70 months of imprisonment in case with an applicable guidelines range of 121 to 151 months, based on defendant's excellent character, genuine remorse, susceptibility to treatment, low risk of recidivism, and strong family support).

The remarkable outpouring of support from so many of Mr. Johnston's friends, family, acquaintances, and co-workers demonstrates that he is a caring, generous, and loveable person.  The numerous letters written to this Court show him to be a man who unselfishly reaches out to others in need.  And they serve as a powerful testament to Mr. Johnston's good character, to his devotion for his wife and family, and to the many challenges he has successfully overcome in his life.

Finally, Mr. Johnston has shown through his own actions that he has not given up hope for himself, but instead is capable of making the right decisions for his future, even when the decisions are difficult.  Through hard work and determination, Mr. Johnston has finally overcome his addiction to heroin.  His therapists attest to his active participation in group and individual therapy and the key role he has played in others' recovery.  Mr. Johnston has also pursued school and vocational studies, including completion of a three-part construction course at San Francisco City College.  Finally, he has maintained a good relationship with the Department of Veteran Affairs in San Francisco, which has employed him in housekeeping and general maintenance from 1997 to 2001 and from 2007 until the time of his arrest.  His supervisors there applaud his diligence, his interpersonal skills, and his willingness to do anything to help.

In short, Anthony Johnston has demonstrated that he has the ability to rise above daunting challenges, to better himself through hard work, and even to become a positive force in the lives of others.  He understands and accepts that he must now pay a substantial debt to society for his misdeeds.  Everyday, he feels tremendous remorse for the pain he has caused to his wife and to all those who love and depend on him.  But he is also steadfast in his resolve to return from incarceration, no matter how long it takes, and once again dedicate himself to becoming a productive and positive member of society.

1  **V.     CONCLUSION**

2        For all of the reasons set forth above, Mr. Johnston respectfully requests that the

3  Court sentence him to a term of 168 months in custody.

4  Dated: July 14, 2010                    Respectfully submitted,

5

6                                          _____/s/_____.

7                                          Miles Ehrlich
                                           Mary Kelly Persyn
8                                          RAMSEY & EHRLICH LLP

9                                          _____/s/_____.

10                                         Karli Sager
                                           Law Offices of Karli Sager
11

12                                         Attorneys for ANTHONY JOHNSTON

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28